IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CECIL DAWSON,

          Plaintiff,

v.                                     No. CIV 02-113 LFG/WWD ACE

P. IELACQUA, CITY OF ALBUQUERQUE,
E & A KAP, INC d/b/a TOWN & COUNTRY
TOWING, and DOES 1-6,

          Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THIS MATTER is before the Court on the parties' cross-motions for summary judgment. On

January 21, 2003, Defendants P. Ielacqua, the City of Albuquerque, Mark Padilla, Nicholas Begay,

Jesus Banuelos and Joe Garcia ("Defendants'") filed a Motion for Summary Judgment as to all of

Plaintiffs' claims. [Doc. 124.] Also on January 21, 2003, Plaintiff Cecil Dawson ("Dawson")[1] filed

two separate Motions for Summary Judgment against Defendants. [Docs. 122 and 123.] Dawson

seeks summary judgment against Banuelos and Garcia on the unreasonable seizure/excessive force

claim [doc. 122], and summary judgment against Ielacqua, Padilla, Begay, City of Albuquerque and

---

[1]Dawson brought this lawsuit as a *pro se* litigant. His two motions for summary judgment [docs. 122 and 123] and his response to Defendants' motion were submitted in his *pro se* capacity. However, in the midst of the briefing, an attorney entered his appearance on behalf of Dawson. [Doc. 132] Dawson's attorney signed the reply pleadings in support of his motions for summary judgment.

Town & Country Towing[2] on his claims of unreasonable seizure and excessive force, unreasonable seizure of property, denial of due process rights, and conversion[3] [doc. 123]. All three motions are fully briefed. No oral argument is necessary. After careful consideration of the parties' briefs and attachments, as well as the pertinent law, the Court concludes that Defendants' motion for summary judgment should be granted and that Dawson's two motions for summary judgment should be denied. Thus, the case will be dismissed.

## Background

Dawson's "First Amended Complaint for Damages and Declaratory Relief – Civil Rights Violations; State Torts; Request for Jury Trial" ("Complaint") [doc. 118] arises from incidents relating to a traffic stop that occurred on September 25, 2001. He sets forth 17 causes of action and requests compensatory damages of $500,000 jointly and severally against the individually named defendants, $1,000,000 in punitive damages against the non-governmental individual defendants, and a permanent injunction against Defendants for towing vehicles without providing a hearing. [Complaint, pp. 10-11.]

Dawson's Complaint alleges the following claims: (1) unreasonable seizure #1 by Defendants Ielacqua, Padilla, Begay in violation of the federal constitution; (2) excessive force by Ielacqua, Padilla, Begay in violation of the federal constitution; (3) false arrest/imprisonment by Ielacqua, Padilla, Begay in violation of the federal constitution; (4) unreasonable seizure #2 and excessive force by Banuelos and Garcia in violation of the federal constitution; (5) false arrest/imprisonment by

---

[2]Town & Country is an automobile towing company doing business in New Mexico. [Complaint, ¶ 7.]

[3]To the extent that Dawson may believe he is alleging state tort claims against the City Defendants, any such claims were dismissed with prejudice in an Order entered October 28, 2002. [Doc. 102.] *But see* additional discussion *infra*.

Banuelos and Garcia in violation of the federal constitution; (6) unreasonable seizure and excessive force by Ielacqua, Banuelos, Garcia, Padilla and Begay in violation of the state constitution; (7) unreasonable seizure of property by Ielacqua, Padilla, Begay and Town & Country in violation of the federal constitution; (8) excessive force by Ielacqua, Padilla, Begay and Town & Country in violation of the federal constitution; (9) unreasonable seizure of property by Ielacqua, Padilla, Begay and Town & Country in violation of the state constitution; (10) excessive force by Ielacqua, Padilla, Begay and Town & Country in violation of the state constitution; (11) denial of due process by Ielacqua, Padilla, Begay, City and Town & Country, in violation of the federal constitution; (12) infliction of punishment without due process by Ielacqua, Padilla, Begay and Town & Country in violation of the federal constitution; (13) infliction of punishment without due process by Ielacqua, Padilla, Begay and Town & Country in violation of the state constitution; (14) conversion against Town & Country; (15) unjust enrichment by Town & Country (16) denial of due process and abuse of process by Ielacqua; and (17) failure to supervise and discipline by the City.  [Complaint].[4]

The following facts are either undisputed by the parties, as set forth in the cross motions for summary judgment, or they are presented in the light most favorable to Dawson based on his deposition testimony.  On September 25, 2001, Defendant Ielacqua, an Albuquerque Airport Police officer stopped Dawson for a traffic violation at 3400 University Blvd., S.E., near but not at the Airport.  Ielacqua approached Dawson, who was driving a leased 1978 Dodge pick-up with a camper shell, and asked if Dawson knew his brake lights did not work.  [Dawson Dep. at 14, 42, Ex. A to Defendants' Motion.]  Dawson was unaware of a problem with his brake lights.  Ielacqua asked for

_____

[4]By prior Orders, the Court dismissed Dawson's numerous "organized crime" RICO claims, as well as his state tort claims.  [Doc. 49, 75, 88, 102.]

Dawson's driver's license, registration and proof of insurance.  Dawson did not have a driver's license and did not believe he needed one, based on his contention that New Mexico law does not require driver's licenses for the use of personal vehicles.  [Dawson Dep. at 42-44.]  He also was unable to provide Ielacqua with his current proof of insurance.  [Id.]  Ielacqua issued Dawson citations for failure to hold a valid driver's license in violation of NMSA 1978 § 66-5-2, and failure to provide proof of insurance on demand, in violation of NMSA 1978 § 66-5-205.  He also was issued a warning for defective brake lights.  [Id. at 43.]  Dawson signed the citations in front of Ielacqua.  [Id. at 46.]

Ielacqua did not arrest Dawson at this point and admits that he was required to release Dawson after Dawson signed the citations.  While Dawson was free to leave, Ielacqua could not allow him to drive away in the pick-up without a valid driver's license and proof of insurance.  *See* NMSA §§ 66-5-2, 66-5-205 (no person shall drive a vehicle without a driver's license and/or current proof of insurance).  Ielacqua contacted his supervisor, Sergeant N. Begay, and requested that Dawson's pick-up be towed due to Plaintiff's failure to provide a valid driver's license and current proof of insurance.

The tow truck arrived and was being positioned to load Dawson's vehicle.  Dawson was outside his vehicle when he signed the citations.  Ielacqua contends that Dawson asked to remove some personal items from his vehicle.[5]  Dawson returned to his pick-up, got into it and started it.  Ielacqua yelled at Dawson to stop.  Dawson began to drive away.  Dawson admits that before he left, Ielacqua, who was to the side of his pick-up, shouted something at him "that likely could have been

---

[5]Dawson neither admitted nor denied affidavit testimony by Ielacqua to this effect.  Thus, to the extent that it is material, the contention is undisputed.

words to the effect of stop, or whatever, but by necessity, I continued to leave." [Id. at 46, 48-49.] When asked whether Ielacqua told Dawson that his vehicle was going to be towed, Dawson concedes that Ielacqua told him that his vehicle was going to be "stolen or taken from me without due process of law" although he did not recall Ielacqua's exact words. [Id. at 46-47.] The tow truck was situated about 20-30 feet directly in front of Dawson's truck, with its bed elevated, so as to load Dawson's vehicle. The tow truck driver was working with the chains or cables on the tow truck in front of Dawson's truck. [Id. at 46-47, 51.] There was a police vehicle 20-30 feet in back of Dawson's truck, and another police vehicle in back of the first. [Id. at 47-48.] It was clear to Dawson that if he did not drive away, "his vehicle would have been stolen." [Id. at 51.]

Ielacqua testified that he reached into the cab through an open window and tried to turn off the ignition, but that while his arm was inside the cab, Dawson drove away dragging and ultimately throwing the officer. Dawson disputes that Ielacqua placed his arm inside Dawson's cab to try to turn off the ignition or that Ielacqua was thrown off Dawson's truck and nearly run-over by Dawson. Ielacqua is "flat out lying" according to Dawson. However, Defendants claim that this factual dispute is immaterial because Dawson knew his truck was about to be towed when he drove away. Dawson agrees that Ielacqua ran some steps towards his vehicle but claims Ielacqua was no closer than five to eight feet when Dawson drove away. Further, it is undisputed that Ielacqua and the tow truck driver were in the near vicinity when Dawson left. It is also uncontested that Dawson placed his vehicle in reverse and then accelerated forward, traveling southbound on University Blvd.

When Dawson pulled away, he was followed by at least three police vehicles, with their flashing lights on (Officer Padilla and Sergeant Begay had joined in the pursuit). [Id. at 52, 54.] Dawson states that he did not have the impression that the police officers wanted him to stop.

Rather, he believed they were trying to kill him because he "didn't bow down and kiss their rear ends, and because [he] was depriving them of the illegal revenue of stealing [his] vehicle."  [Id. at 53.] Dawson claims that he had to engage in defensive driving and that he "dodged, slammed on my brakes, accelerated, got out of their way" for about two miles.  [Id. at 54-55.]  He finally stopped [on northbound Broadway] because police officers had pulled guns and were threatening to kill him.  He stated he voluntarily stopped because he might have "had to run over or run into, probably, an innocent cop, if there is such a thing."  "Besides, I didn't want to damage my leased property, because I would have had to pay for it."  [Id. at 55.]

Dawson was removed from the truck and placed on the ground where he claims about three officers were on top of him and placed handcuffs on him.  He alleges that he was dragged out of his vehicle, thrown to the ground and held down by officers who had their knees in his back.  [Complaint, ¶ 11.]  He was handcuffed face down.  He was then placed in a seated position on the side of the road.  [Id. at 57.]  He recalls seeing the tow truck arrive and remove his pick-up.

Dawson began to feel chest pain when the officers "were sitting on top" of him.  He believes he was having a heart attack when the officers were removing him from his pick-up.  [Id. at 59.]  He screamed that he could not breathe when the officers were on his back.  Paramedics were called to the scene to evaluate Dawson and Dawson was then taken to the Heart Hospital.  He was handcuffed to the gurney during the transport by ambulance.  [Id. at 60.]

6

Several days later, on September 28, 2001, while still at the Heart Hospital, Dawson underwent quadruple by-pass heart surgery.  The hospital discharge summary[6] indicates that the cardiac catheterization revealed three vessel coronary artery disease involving all the major coronaries.[7]  [Ex. G to Defendants' Motion.]  Dawson alleges, however, that his heart attack was proximately caused by Defendants' actions.  While Dawson was in the Heart Hospital, a police hold was placed on him and the hospital was requested to advise Aviation Police of his discharge.  [Doc. 125, Ex. B.]

Ielacqua completed a Criminal Complaint charging Dawson with two counts of aggravated assault upon a peace officer, in violation of NMSA 1978 § 30-22-22, relating to Dawson's conduct and the chase on September 25, 2001.  These are felony charges.  [Doc. 125, Ex. B, attachment.] Ielacqua alleged in the Criminal Complaint that Dawson had almost run him over when Ielacqua tried to stop Dawson from driving away from the scene and that Dawson swerved at Begay's car causing Begay to take evasive action to avoid a collision.  Ielacqua also alleged in the Complaint that while driving southbound on Broadway, Dawson sometimes crossed over into northbound lanes.  [Id.]

On October 2, 2001, Dawson was discharged from the Heart Hospital.  Defendants Banuelos and Garcia, Albuquerque Aviation Police Officers, were informed of his discharge, given a copy of

---

[6]Dawson contends that the hospital report and two other exhibits pertaining to his subsequent convictions should be stricken because they are unauthenticated.  Defendants attached authenticated copies of the exhibits to their reply.  [Doc. 136.]  Thus, Dawson request to strike the exhibits is denied.  Moreover, it is noteworthy that Dawson did not attempt to deny the contents of the hospital report.  In addition, he argues that "there is simply no admissible evidence to support any such contention [that he was convicted of driving without a license]," [doc. 125, p. 5, n. 2].  The argument is specious in light of the Final Order on Metropolitan Appeal, setting forth the Court's finding that Dawson was guilty of all charges, which included driving without a driver's license in violation of § 66-5-2.  [Doc. 136, Ex. 5.]  In addition, even if the exhibits were considered hearsay as Dawson argues, most likely all of the documents at issue would be admissible under the exception to hearsay as records of regularly conducted activity.

[7]Dawson had prior problems with his heart.  His medical history is discussed further in the Court's Order, entered January 9, 2003.  [Doc. 120.]

the Criminal Complaint and directed to pick up Dawson and book him into the Bernalillo County

Detention Center ("BCDC").  [Doc. 125, Ex. H.]  At about noon, the officers took custody of

Dawson in his hospital room and placed him in handcuffs.  [Doc. 122.]  They did not have an arrest

warrant. At BCDC, the paramedic or EMT directed the officers to take Dawson to University

Hospital for an evaluation.  University Hospital personnel stated that Dawson could be returned to

BCDC.  Due to concerns about incarcerating an individual who had undergone heart surgery,

Banuelos contacted the District Attorney.  The DA advised the officers to release Dawson after

informing Dawson that he would receive information relating to his future Court appearance.

Dawson was released at about 2:40 p.m.  [Doc. 122, p. 4.]

On November 28, 2001, Dawson was also found guilty of driving without a valid driver's

license.  He appealed this conviction and, on a *de novo* appeal, he was again found guilty.  [Doc. 136,

Ex. I, J.]  On about October 29, 2002, a jury found Dawson guilty of battery.[8]  [Doc. 136, Ex. J-1.]

## Summary Judgment Standard

Summary judgment is appropriate when the moving party can demonstrate that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

law.  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S. Ct. 1598 (1970);

Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir. 1995).  The

party moving for summary judgment has the initial burden of establishing, through admissible

evidence in the form of depositions, answers to interrogatories, admissions, affidavits or documentary

evidence, that there is an absence of evidence to support the opposing party's case and the moving

---

[8]According to Defendants, the charges were reduced from 2 felony counts of aggravated assault to one
misdemeanor count of battery, of which he was convicted and sentenced to 180 days in jail.  [Doc. 131, p. 6.]

party is entitled to judgment as a matter of law.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986).

Once the moving party meets its burden, the party opposing the motion must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49, 106 S. Ct. 2505, 2510 (1986); <u>Biester v. Midwest Health Servs, Inc.</u>, 77 F.3d 1264, 1266 (10th Cir. 1996).  The party opposing the motion may not rest upon the mere denials of his pleadings to avoid summary judgment.  Fed. R. Civ. P. 56(e);  <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 891 (10th Cir. 1991).

However, the Tenth Circuit has recently explained that the nonmovant's burden to respond arises only where the summary judgment motion is properly "supported."  <u>Reed v. Bennett</u>, 312 F.3d 1190, 1194 (10th Cir. 2002).

> Accordingly, summary judgment is 'appropriate' under Rule 56(e) only when the moving party has met its initial burden of production under Rule 56(c).  If the evidence produced in support of the summary judgment motion does not meet this burden, ' summary judgment must be denied, *even if no opposing evidentiary matter is presented.*

<u>Id.</u> (emphasis in original) (internal citation omitted).

## Analysis

## I.    QUALIFIED IMMUNITY STANDARD

Defendants contend that all of the individually named officers are entitled to qualified immunity as to the claims of false/unlawful arrest, unreasonable seizure, and excessive force.  Title 42 U.S.C. § 1983 provides a private right of action against public officials, including police officers, who, while acting under color of state law, violate an individual's federal constitutional or statutory rights.  The defense of qualified immunity, however, protects § 1983 defendants from liability for civil

damages when performing discretionary functions, unless such conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known.  *See* Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034 (1987).

The qualified immunity inquiry must begin with this threshold question: based upon the facts taken in the light most favorable to the party asserting the injury, did the officer's conduct violate a constitutional right?  Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 2156 (2001).  If no constitutional right was violated, the court need not proceed any further.  Id.  If, however, a constitutional violation did occur, the second inquiry is whether the officer could nevertheless have reasonably but mistakenly believed that his conduct did not violate a clearly established constitutional right.  Id. at 2158-59.  Saucier's instructions require courts to focus first on the underlying constitutional issue in order to assist courts in disposing of insubstantial suits at an early stage of litigation.  Id. at 2156.  "A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all."  Seigert v. Gilley, 500 U.S. 226, 232, 111 S.Ct. 2920 (1991).

### A.   Unlawful Stops/Seizures/Arrest

Dawson claims a number of constitutional violations with respect both to the stops on September 25, 2001 and actions by officers on October 2, 2001, when officers came to Dawson's hospital room, placed him in handcuffs and escorted him to BCDC.

### 1.   *September 25, 2001*:

Dawson claims that the first stop by Ielacqua on September 25 was unlawful on the sole ground that Ielacqua was an airport officer who was acting outside of his jurisdiction when he pulled

over Dawson on 3400 University Blvd. S.E., which is not airport property.  [Doc. 129, p. 5.]
Defendants state that 3400 University Blvd. S.E. is within the jurisdictional boundaries of the Airport
and that Albuquerque airport police officer Ielacqua had the authority to make the stop.  In their
response to Dawson's Motion for Summary Judgment, Defendants attach a map of the jurisdictional
boundaries of the airport showing the portion of Broadway Blvd. where Dawson was stopped.  [Doc.
130, Ex. A.]  Dawson claims the map does not support Defendants' position, but provides neither
affidavit nor other evidence to raise a genuine issue of material fact as to Ielacqua's jurisdictional
authority.  Thus, the claim that the first stop was unlawful fails.  Moreover, any allegation by Dawson
that the first stop or detention was unlawful would be defeated due to Dawson's later conviction for
driving without a valid driver's license.  *See* Heck v. Humphrey, 512 U.S. 477, 487 n. 6, 114 S.Ct.
2364 (1994) (a conviction forestalls claim by plaintiff for civil rights violations based on false arrest
because the subsequent conviction establishes the reasonableness of the officers' actions in making
the arrest).

It is conceded by Defendants that Dawson was not arrested during the first stop and was free
to go, *albeit* without his vehicle.[9]  During the second stop, however, Dawson was detained and
handcuffed and certainly would have been taken to jail had he not needed and received immediate
hospital care for his heart problems.  With respect to the second stop, Dawson asserts that his Fourth
Amendment right to be free of an unreasonable seizure was violated, and essentially challenges the
constitutionality of that warrantless arrest.  A police officer violates an arrestee's clearly established

---

[9]A decision to impound a vehicle is reasonable under certain circumstances and the Fourth Amendment
does not require, for example, that the police allow an individual to arrange for another to pick up the car to avoid
impoundment.  Smyth v. D. Colorado Lakewood, 83 F.3d 433 (Table, Text in Westlaw), 1996 WL 194715, at *4
(10th Cir. Apr. 19, 1996) (citations omitted).  *See* additional discussion *infra*.

Fourth Amendment right to be free of unreasonable seizures if he makes a warrantless arrest without probable cause. The constitutionality of a warrantless arrest is examined under the probable cause standard.

> A police officer may arrest a person without a warrant if he has probable cause to believe that person committed a crime. Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense. When a warrantless arrest is the subject of a § 1983 action, the defendant arresting officer is entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest the plaintiff. Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity.

Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995) (quotations and citation omitted).

Dawson's scenario does not present even arguably a close call. Nonetheless, Dawson argues that the second stop on Broadway, after he drove away from 3400 University Blvd., was an unlawful seizure by Defendants Ielacqua, Padilla and Begay and that the seizure resulted in his false arrest or imprisonment. [Counts 1, 3, 6.[10]] Again, the fact that Dawson was later convicted of a battery, relating to his alleged actions preceding the second stop [see Criminal Complaint], flatly contradicts Dawson's position that the second stop was unreasonable.

---

[10]Counts 1 and 6 of Dawson's Complaint seem to assert an unreasonable seizure related to actions of Ielacqua, Padilla and Begay in violation of Dawson's federal and state constitutional rights. Just as Dawson's state common law tort claims were dismissed due to absence of any waiver of immunity under the New Mexico Tort Claims Act and/or failure to comply with mandatory notice requirements under the Tort Claims Act, so too must the state constitutional claims be dismissed. "In the absence of affirmative legislation, the courts of this state have consistently declined to permit individuals to bring private lawsuits to enforce rights guaranteed by the New Mexico Constitution, based on the absence of an express waiver of immunity under the Tort Claims Act." Barreras v. State of New Mexico Corrections Dep't, 62 P.2d 770, 2003-NMCA-027, ¶ 24 (Ct. App. 2002), cert. denied, ___ P.3d __ (N.M. 2003). Even if there were waiver for Dawson's constitutional tort claims, he did not comply with mandatory notice requirements of the New Mexico Tort Claims Act. [Doc. 102.] Moreover, even if Dawson's state constitutional claims somehow could be considered, they would fail on the merits for the reasons discussed infra.

Moreover, Dawson's arguments that Defendants failed to articulate a "reasonable suspicion of criminal activity" necessary to justify the second stop is belied by Dawson's conduct in driving away from the scene where he knew his truck was about to be towed, in insisting on driving without a valid driver's license right and current proof of insurance after signing and acknowledging citations for the violations, in failing to comply with police commands to stop which he admittedly heard, in ignoring an officer who ran towards him as he was leaving the scene, in persisting to attempt to evade police for about two miles when he observed police vehicles behind him with their emergency lights on, and in driving erratically. Frankly, it is difficult to understand how Dawson could convince himself, with a straight face, much less the Court, that his conduct was anything other than violative of state laws at this point as well dangerous both to himself and to the safety and well being of others in the area. Certainly, the Court is convinced that police officers, who were observing his conduct, had a reasonable suspicion of criminal activity when they stopped Dawson the second time. Indeed, the crimes for which he was stopped occurred in the officers' presence and there was no need for a warrant. *See* U.S. v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (traffic stop is valid under the Fourth Amendment if the police officer had reasonable articulable suspicion that motorist violated applicable traffic regulations, etc.), *cert. denied*, 518 U.S. 1007 (1996). Thus, because the facts do not indicate that any constitutional violations occurred with respect to Dawson's claims relating to alleged unlawful stops, seizures and/or arrests on September 25, the Court will grant summary judgment to Defendants on these claims.

2.    ***October 2, 2001:***

This claim relates to the two hours and 40 minutes Dawson was detained by police when he was discharged from the Heart Hospital and taken to BCDC and then to University Hospital on

13

October 2nd.  Dawson claims that he was subjected to an unreasonable seizure by Defendants Banuelos and Garcia in his hospital room, on the day of his discharge from the hospital.  [Doc. 122.] Specifically, Dawson alleges that four days after having open heart surgery, "with plaintiff's chest stapled and taped, and while on portable oxygen," Banuelos and Garcia unlawfully handcuffed Dawson and took physical custody of him inside his hospital room, without consent to enter Dawson's hospital room.  Dawson complains that the arrest was made without a warrant in violation of his Fourth Amendment rights and without any probable cause that he had committed a crime.  He also asserts that he had a reasonable expectation of privacy in his hospital room, which was violated by the officers' entry.  (Dawson's related claim of excessive force by Banuelos and Garcia is analyzed *infra*.)

Defendants claim that they are entitled to qualified immunity.  They specifically argue that Banuelos and Garcia acted reasonably in picking up Dawson from the hospital when he was about to be discharged because Dawson was on police hold during his hospital stay, i.e., not free to leave. Defendants also assert that they acted reasonably based on instructions by their superior to take Dawson for booking at the jail in relation to the felony charge against Dawson of aggravated assault, set forth in the criminal complaint prepared by Ielacqua.  The Court agrees with Defendants.

The officers' actions in handcuffing Dawson and taking him to BCDC for booking cannot be viewed in isolation from Dawson's arrest on September 25, 2001, at which time he was charged with two counts of felony aggravated assault of a police officer.  But for Dawson's heart condition and subsequent heart surgery, he would have been taken to jail and booked on September 25, 2001, after he was stopped the second time by Ielacqua.  A warrantless arrest for a felony normally is permissible as long as the arresting officer had probable cause for the arrest.  United States v. Klein, 93 F.3d 698,

14

701 (10th Cir.) (internal citation omitted), *cert. denied*, 519 U.S. 1048 (1996).  Even warrantless misdemeanor arrests for minor crimes do not violate the Fourth Amendment.  Atwater v. City of Lago Vista, 532 U.S. 318, 354, 121 S.Ct. 1536, 1557 (2001) (discussing warrantless arrest of motorist for seatbelt violations).  This Court has already determined that when Defendants stopped Dawson for the second time, they unquestionably had the knowledge and "reasonably trustworthy information to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense."  Id. at 701.  Thus, as stated previously, the initial warrantless arrest was supported by probable cause and was lawful.

However, because Dawson was in immediate need for medical treatment, he was taken to the hospital and placed on police hold during his stay there, rather than being taken to jail.  [Doc. 125, p. 5.]  The "hold" meant that Dawson was not free to leave the hospital.  The time spent at the Heart Hospital is attributed to Dawson's medical condition and surgery.  On October 2, when Dawson was discharged, Banuelos and Garcia were merely completing the arrest of Dawson that was started on September 25.  While they were not the officers who observed Dawson's alleged felonious conduct on September 25, they were aware of that conduct based on the Criminal Complaint that they possessed.  "[P]robable cause can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest."  Klein, 93 F.3d at 701 (internal citation omitted).  Therefore, this Court finds no genuine issue of material fact with respect to an alleged constitutional violation by Banuelos and Garcia.

In addition, even if Banuelos and Garcia acted mistakenly in failing to secure an arrest warrant before taking Dawson into custody on October 2, their mistake was reasonable given the totality of the circumstances.  Here, they were acting in accordance with instructions from their superior to pick

up Dawson upon his discharge and take him for booking at BCDC.  They had in their possession a copy of the Criminal Complaint charging Dawson with felony counts of aggravated assault on a police officer.  Clearly, the officers could have reasonably believed that they did not need an arrest warrant under these circumstances before picking up Dawson, and therefore, are entitled to immunity for their actions.  Thus, any and all claims of unreasonable seizure, false arrest or false imprisonment of Dawson by Banuelos and Garcia must be dismissed under the doctrine of qualified immunity.  *See* Saucier v. Katz, 533 U.S. 194.

In addition to the extent that Dawson attempts to liken privacy expectations in his home to those in a hospital room, his argument is unavailing.  *See, e.g.,* United States v. George, 987 F.2d 1428, 1432 (9th Cir. 1993) (even if the defendant had a subjective expectation of privacy in his hospital room, that expectation was not objectively reasonable); United States v. Franklin, 64 F.Supp. 2d 435, 439 (E.D. Penn. 1999) ("We seriously doubt that the defendant had any reasonable expectation of privacy in the hospital emergency room which he shared with all the medical personnel").  Similarly, while Dawson may have had a subjective expectation of privacy in his hospital room, that expectation is not objectively reasonable when medical personnel, including doctors, nurses, technicians and aides, freely enter and exit his room.

**B.**   **Excessive Force**

Dawson next alleges that Defendants used excessive force in seizing him during the second stop, in taking him to the jail after his heart surgery, and in seizing his vehicle.  [Counts 1, 2, 4, 6, 8, and 10.[11]]  Defendants assert that they are entitled to qualified immunity.

---

[11]Again, Dawson's duplicative state constitutional claim must be dismissed for the reasons stated *supra* in footnote no. 9, and also for the additional reasons set forth in discussing his federal constitutional claims.

The Fourth Amendment guarantees citizens the right to be free from the use of excessive force by government officials during the course of an arrest. Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865 (1989). Police officers may only use such force as is "objectively reasonable" under the circumstances. Id. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. (internal citation omitted). The "reasonableness inquiry" "must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id. at 396-97. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers' violates the Fourth Amendment." Id. at 396 (internal citation omitted). Factors that may be considered in analyzing whether an officer acted with objective reasonableness include the alleged crime's severity, the potential threat that the suspect poses to officers' and others' safety, and the suspect's efforts to resist or evade arrest. Medina v. Cram, 252 F.3d 1124, 1131 (10th Cir. 2001) (citing Graham).

While the test of reasonableness is frequently a question for the jury to determine, it may be determined as a matter of law, if, after resolving all factual disputes in the plaintiff's favor, the officer's actions were "objectively reasonable." Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994), cert. denied, 515 U.S. 1159 (1995); Medina, 252 F.3d at 1131. Thus, to defeat a qualified immunity defense in an excessive force case, Dawson must "show not just that the officer used an unreasonable level of force, but also that the force he did use was more than the result of a mistaken understanding of the level of force necessary under the circumstances." Henry v. Albuquerque Police Dep't, 49 F.3d. Appx. 272, 275, 2002 WL 31379859 at *3 (10th Cir. Oct. 23, 2002) (citing Saucier).

Here, Dawson sets forth three alleged instances of excessive force: (1) during the second stop, Defendants "dragged [Dawson] out of his vehicle, [threw him] to the ground, and held [him] down by them with their knees in his back," handcuffed his hands to the gurney for transport to the hospital, and handcuffed him to the hospital bed during the night at the hospital; [Complaint at ¶¶ 11, 14, 15]; (2) when Defendants Banuelos and Garcia came to his hospital room, they handcuffed him; (3) and by seizing Dawson's vehicle.

### a.   *Excessive Force During Second Stop*

Dawson argues first that the Court need not even reach the excessive force claim because no force is allowed when the stop or arrest was unlawful. It is true that an excessive force claim may be subsumed in an illegal stop or arrest claim, Jackson v. Sauls, 206 F.3d 1156, 1170-71 (11th Cir. 2000). However, here, the Court already has determined that Dawson failed to raise a genuine issue for trial with respect to the lawfulness of the stops, seizures and/or arrest.

Dawson next contends that there was no basis to stop him because he engaged in no crime, other than to ignore "unauthorized" directions by a police officer to "stop leaving the scene." Dawson cites Florida v. Royer, 460 U.S. 491, 498, 103 S.Ct. 1319 (1983) for the proposition that "ignoring police demands to 'stop', without more, is no grounds for seizing anyone . . . ." [Doc. 129, p. 7.] Dawson unsuccessfully attempts to re-hash his argument that the stop or seizure were unlawful. Moreover, Royer is of no assistance to Dawson. In that case, the United States Supreme Court explained that when the police approach someone and ask if they are willing to answer some questions, that person is free to decline to answer. The failure to answer the questions, in itself, is insufficient to provide reasonable grounds for a detention. Id.

18

Here, as discussed above, the police did not just casually walk up to Dawson and inquire whether he might answer a few questions.  Rather, the police pulled Dawson over for traffic violations and cited him for driving without a valid driver's license which he does not believe he needs. Dawson then drove away requiring police to chase him for about two miles with their emergency lights on.  Dawson's initial traffic violations, including non-functioning brake lights and failure to carry current proof of insurance, are not serious infractions.  However, his decision to leave the scene after being told his vehicle was going to be towed, after seeing the tow truck present and ready to load his vehicle, and after police yelled at him to stop and ran towards his vehicle, dramatically changed what police actions might be considered objectively reasonable.  This would be so even if the Court did not consider Ielacqua's testimony that he was dragged away by Dawson while hanging onto the truck and nearly run over by the fleeing Dawson.  In other words, Dawson's two mile drive during which time he was dodging and braking and essentially trying to evade the police cruisers that were chasing him do not constitute a mere denial to answer police inquiries.  He was actively evading police and posing a danger to himself and the public as well as officers.  There was a significant safety interest in controlling Dawson after he had heard warnings from officers and had defied those orders.  Like Grauerholz v. Adcock, 51 Fed. Appx. 298, 300, 2002 WL 31579878 at *2 (10th Cir. Nov. 20, 2002), this case "presents the classic situation in which a plaintiff's own actions in reaction to a legitimate law enforcement encounter . . . justif[y] the subsequent actions of the law enforcement officers involved." (internal citation omitted).  As Dawson's dangerous conduct increased, so, too, did the officers' need to stop and subdue him.

With these circumstances in mind, the officers' actions in removing Dawson from his vehicle, placing him on the ground and putting their knees in his back to handcuff him, after which he was

placed in a seated position, cannot be construed as objectively unreasonable, nor was the force used

the result of a mistaken understanding of the level of force necessary under the circumstances.

Viewing the officers' conduct from the perspective of the officer on the scene, as the Court must, the

actions of the officers were well within the range of objective reasonableness.

        In addition, it is noteworthy that Dawson never specifically argues that he was injured by the

knee in his back or by the handcuffs.[12]  Moreover, even painful handcuffing, without more, does not

necessarily demonstrate excessive force.  Rodriguez v. Farrell, 280 F.3d 1341, 1350-51 (11th Cir.

2002), pet'n for cert. filed, 71 U.S.L.W. 3339 (9/13/02);  Brissett v. Paul, 141 F.3d 1157, 1998 WL

195945 at *4 (4th Cir. 1998); Gold v. City of Miami, 121 F.3d 1442, 1446 (11th Cir. 1997) (qualified

immunity granted where the plaintiff's pain from being handcuffed for 20 minutes was not sufficient

to inevitably lead a reasonable officer to conclude that the use of force was unlawful), cert. denied,

25 U.S. 870 (1998).[13]

---

[12]Dawson does claim that the officers' actions caused his heart attack.  The Court denied Defendants' previous motion for summary judgment as to the issue of causation.  However, the Court advised Dawson that while it could not decide the issue as a matter of law at that stage of the proceedings, the claim appeared weak based on the medical evidence that was submitted by Defendants and the total absence of expert medical evidence from Dawson.

[13]This case is distinguishable from Henry v. Albuquerque Police Dep't, 49 Fed. Appx. 272, 2002 WL 31379859 (10th Cir. Oct. 23, 2002), wherein the Court determined fact issues remained as to the excessive force claim by a motorist.  In Henry, the plaintiff was stopped for driving a truck without a license plate.  The officer discovered that the motorist's license was suspended and called for a tow truck.  The plaintiff re-entered her truck, and the officer "grabbed her by the arms and legs and removed her."  She claimed that the officer "punched her in the face, a blow that fractured her nose."  In viewing the evidence in the light most favorable to Henry, the Court noted that the officer denied striking the plaintiff but did not deny grabbing her as alleged.  She also provided a report from a radiologist six days after the event that showed a "[s]mall non-displaced fracture at the tip of her nasal bone" and a "lump at the bridge of her nose."  Id. at *3.  The Court concluded that the officer's flat denial that he used the type and level of force of which he was accused might be effective at trial, but that for purposes of qualified immunity he made no claim that the force used was reasonable given the circumstances or that he might have been mistaken, but not unreasonably so.  Here, in contrast, there does not appear to be a factual dispute as to the amount of force used, and Defendants do claim that they acted reasonably, even if they were mistaken.  Moreover, Dawson's actions in attempting to evade the police are significantly greater than those taken by Henry.

With respect to Dawson's claim that excessive force was used during the second stop, the Court concludes that there is no genuine issue of material fact as to the inquiry of whether Dawson's constitutional right was violated.  No reasonable jury could conclude, based on these facts, that Dawson was subjected to excessive force when he was pulled out of his vehicle, placed on the ground, and kneed while being placed in handcuffs.  This is true, even if Dawson was dragged out of the vehicle and thrown onto the ground as he alleges.  Thus, Dawson's excessive force claim must necessarily fail.

### b. *Excessive Force at the Hospital*

It is unclear whether Dawson also alleges that the use of handcuffs by officers was excessive when the picked him up in his hospital room at the time of discharge.  To the extent that he does, this claim fails as well, primarily for the reasons stated above.  In addition, however, the officers who went to the hospital possessed the Criminal Complaint that charged Dawson with aggravated assault of a police officer.  Even if the original charges were subsequently reduced to a charge of battery of which Dawson was convicted in this case, the officers held the reasonable belief based on the Criminal Complaint that Dawson allegedly had assaulted police officers.  The Court concludes, therefore, that the minimal safeguard of handcuffing him was objectively reasonable under these circumstances.  Accordingly, to the extent Dawson contends that excessive force occurred at the Heart Hospital, this claim, too, fails.

### c. *Seizure of Vehicle*

Dawson also apparently alleges that the seizure of his leased vehicle constituted the use of excessive force and/or was a violation of his Fourth Amendment rights.  His claim is untenable. Section 8-5-2-4 of the Albuquerque municipal ordinances authorizes the impounding of a vehicle

within the City limits, without notice to the owner, when the driver does not have a driver's license or fails to have proof of current insurance on the vehicle. City of Albuquerque Ordinance § 8-5-2-4(15)(a) and (b). Thus, the officers' action in having the car towed was objectively reasonable, particularly in these circumstances where there was no one with a valid driver's license or current insurance to drive the truck.

In addition, the Albuquerque City Ordinances authorize summary vehicle impoundment or relocation when the driver in control of the vehicle is lawfully taken into custody by the police and the vehicle is left at a certain location or that location is such that a reasonable person would believe the owner would desire relocation or removal. City of Albuquerque Ordinance, § 8-5-2-4(7). It is most unlikely, if not unreasonable, to believe that the vehicle should have been left abandoned on the roadside, particularly in view of Dawson's concerns about having to pay the leasing company for possible damage. Moreover, the United States Supreme Court has recognized that the authority of police to seize and remove vehicles from the street that may threaten public safety and convenience is "beyond challenge." South Dakota v. Opperman, 428 U.S. 364, 368-369, 96 S.Ct. 3092, 3097 (1976). The Court defined such actions of the police to be part of its "community caretaking functions." Id. The right of an officer to tow an abandoned vehicle, especially near an airport, has become all the more significant due to safety and security concerns subsequent to the September 11, 2001 terrorist incidents.

In Smyth, the plaintiff was pulled over for speeding and placed under arrest. He was charged with speeding, expired plates and an outstanding warrant for his arrest. Like Dawson, he brought a number of § 1983 civil rights claims against both the officers and the company that towed his vehicle. 83 F.3d 433, 1996 WL 194715 at *1. The district court granted summary judgment to the

22

defendants based on qualified immunity.  Id. at *2.  The Tenth Circuit affirmed, reasoning in part, that after arresting the plaintiff, the police were entitled to have his car towed away, "either for safekeeping or because it was a hazard, or both.  Id. at *4.  Based on the record in that case and the information available to the officer, the officer's decision to impound the car was reasonable and proper.  Id. (citing United States v. Kornegay, 885 F.2d 713, 716 (10th Cir. 1989), cert. denied, 495 U.S. 935 (1990); United States v. Agofsky, 20 F.3d 866 (8th Cir.) (Fourth Amendment does not require police to allow arrested person to arrange for another person to pick up arrested person's car to avoid impoundment), cert. denied, 115  S.Ct. 280) (1994); United States v. Harvey, 16 F.3d 109 (6th Cir.) (police lawfully exercised their discretion to impound stopped car in absence of any licensed driver to attend to it), cert. denied, 115 S.Ct. 258 (1994)).

Similar to Smyth, Dawson's claim regarding the seizure of his vehicle does not constitute a Fourth Amendment violation.  Indeed, Dawson has not "asserted a violation of a constitutional right at all."  Thus, this claim too must be dismissed.

## II.   DUE PROCESS CLAIMS

Dawson's claim that his leased vehicle was towed or seized in violation of his due process rights may be the heart of his complaint.  At least nine of the seventeen claims concern or mention the seizure of his vehicle.  Dawson makes the incredulous assertion that "the real reason" for towing his vehicle was to provide it to "some other private party (to be held for ransom or whatever else it wanted)."  [Doc. 133, p. 7.]

Dawson specifically alleges that his vehicle was improperly seized on September 25, 2001 and that he was entitled to a pre-deprivation hearing or notification of his hearing rights, and that in any event, he did not receive any hearing or notice of his right to a hearing, either before or after the

23

seizure of the vehicle.  He claims violations of his Fourth[14] and Fourteenth Amendment rights.
Dawson further states that Defendant Town & Country refused to release the vehicle to him unless
it received payment, and that Dawson paid $145 to obtain the truck.

Due process requires that certain procedures be followed before an individual can be deprived
of protected property interests.  Mathews v. Eldridge, 424 U.S. 319, 332, 96 S.Ct. 893 (1976).  Due
process, however, is a flexible concept, and its procedural protections vary depending on the
particular type of deprivation involved.  Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593,
2600 (1972).  Generally, due process requires that a hearing be provided at a meaningful time and
in a meaningful manner, before an impartial decision maker.  Mathews, 424 U.S. at 332-34.

It appears well settled that under the Mathews balancing test, neither pre-tow notice nor a
pre-tow hearing is constitutionally required as long as there is a possibility of a prompt post-tow
notice and hearing.  Petty v. Board of Commissioners, 957 F. Supp. 1207, 1212 (D. Kan. 1997)
(citing Scofield v. City of Hillsborough, 862 F. 2d 759, 764 (9th Cir. 1988)).  See also Goichman v.
City of Aspen, 859 F.2d 1466, 1468 (10th Cir. 1988) (discussing another challenge to a towing
ordinance where the Tenth Circuit decided that the city need not provide a hearing before requiring
that the owner of an impounded vehicle pay fees to recover it) (internal citation omitted).  Thus,
Dawson's claim that he was entitled to notice or a hearing before his truck was towed must
necessarily fail.

While no predeprivation notice or hearing is constitutionally required before a vehicle can be
towed, there must be an opportunity for a prompt post-towing hearing.  Scofield, 862 F.2d at 762-65;
Draper v. Coombs, 792 F.2d 915, 922-23 (9th Cir. 1986); Stypmann v. City and County of San

_____

[14]The Fourth Amendment claim with respect to the seizure of his vehicle was analyzed and rejected supra.

<u>Francisco</u>, 557 F.2d 1338, 1342-44 (9th Cir. 1977).  Here, it is undisputed that the City Ordinances provide for an immediate hearing and notice of the opportunity to request a hearing.  Dawson never sought relief under the specific, well-defined procedures provided for under municipal law.  The City Ordinance provides for written notice to the owner of the vehicle within 24 hours of towing.  The notice supplies the owner with information to contest the validity of the impoundment, including how to request a hearing in writing.  Albuquerque City Ordinances, § 8-5-2-5 (8).  Therefore, due process is served because there is an opportunity for notice and a hearing to challenge the underlying alleged deprivation.

Dawson asserts that his due process rights were violated because he never received any type of notice of his right to request a hearing and that he should not be forced to figure that out on his own.  The City admits that it did not specifically notify Dawson of his right to contest the impoundment through a hearing.

However, even with the failure to provide Dawson with written notice, under the circumstances present here, the Court finds that Dawson fails to present a genuine issue of material fact to show that the City's error in providing notice of his hearing rights was anything but harmless.  Dawson did not supply a date by which he had retrieved his car after paying a towing or impoundment fee to Defendant Town & Country.  However, he also does not allege that he was without his vehicle for any length of time, and it appears that he would not have been able to drive from September 25 to October 2, due to his heart surgery.  Indeed, it is unclear after open heart surgery, if he was immediately released to drive a vehicle.  In any event, while Dawson did not receive notice of his right to challenge the seizure of his vehicle and information about the vehicle's

whereabouts, clearly Dawson had enough information to retrieve the truck and pay the fees to release it to him. Thus, the deprivation was harmless, temporary in nature, and at best, de minimis.

The relative weight of a property interest is relevant to the form of notice and hearing required by due process. *See, e.g.,* Boddie v. Connecticut, 401 U.S. 371, 378, 91 S.Ct. 780, 786 (1971) . While some form of notice and hearing is required with respect to a deprivation of a property interest, this is less true when the property interest is characterized as "de minimis." Sniadach v. Family Finance Corp., 395 U.S. 340, 342, 89 S.Ct. 1820, 1823 (1969) (Harlan, J., concurring); Goss v. Lopez, 419 U.S. 565, 576, 95 S.Ct. 729, 737 (1975). Here, the inconvenience to Dawson in this case was slight in the sense that he does not allege or establish that he was without his vehicle for any length of time when he actually could drive it. *See* Sewell v. Jefferson County Fiscal Court, 863 F.2d 461, 467 (6th Cir. 1988) (holding no due process violation when plaintiff was demoted without a hearing but subsequently reinstated with full back pay), *cert. denied*, 493 U.S. 820 (1989). Thus, Dawson suffered no deprivation of property that rose to a constitutional level. *See* Polite v. Diehl, 507 F.2d 119, 143 (3d Cir. 1974) (Kalodner, J., concurring in part and dissenting in part) (" . . . there is no 'wrongful deprivation of property . . . under color of state law' when a policeman orders an automobile with a smashed radiator towed away while he takes its operator . . . to a hospital, and the car is returned to its owner the next morning."), *abrogated on other grounds in* 471 U.S. 261 (1985).

Similarly, in Kostiuk v. Town of Riverhead, 570 F. Supp. 603, 608 (E.D.N.Y. 1983), the Court held that the overnight impoundment of the plaintiff's dog did not rise to the level of a constitutional deprivation and was "de minims" as well. This was true because the plaintiff knew where the property was, knew she would get it back soon, in that case after one night, and the property was not expected to be and was not, in fact, permanently damaged. Id. at 609.

So, too, here.  Dawson clearly knew where his property was, must have gotten it back soon after he was discharged from the hospital, the property was not expected to be held indefinitely or permanently and it was not damaged.  Additionally, it is unclear what possible bases Dawson could have asserted at a hearing challenging the officers' right to tow.  As previously indicated, City's municipal ordinances, along with legal precedent, allow for the impoundment of a vehicle under the circumstances present.  *See* discussion *supra* at pp. 21-23.  Moreover, Dawson had other options to pursue even if the deprivation was of constitutional magnitude.  Under the holding in <u>Parratt v. Taylor</u>, 451 U.S. 527, 540, 101 S.Ct. 1908, 1915 (1981), *overruled on other grounds*, 474 U.S. 327 (1986), where a predeprivation hearing is meaningless or impracticable and state tort remedies can fully compensate the victim for his loss, state postdeprivation remedies can provide the requisite due process.

For the reasons stated above, all of Dawson's due process claims are dismissed.

## III.   STATE LAW CLAIMS AGAINST CITY

Dawson appears to allege state tort claims of conversion and abuse of process against the City and/or the City Defendants.  [Counts 15 and 16.]  Section 41-4-4 of the New Mexico Statutes Annotated grants immunity from tort liability to a governmental entity and any public employee acting within the scope of duty, unless there is a waiver of immunity.  Dawson claims that § 41-4-12 provides a waiver of immunity for law enforcement officers who violate property rights.  Dawson misreads the statute.  His claim of conversion is one sounding in tort, even if he likens it to a constitutional deprivation.  Torts are separate and distinct from a constitutional deprivation involving property rights.  <u>Wells v. County of Valencia</u>, 98 N.M. 3, 644 P.2d 517 (1982).  Thus, there is no waiver of immunity from suit for the torts of conversion or abuse of process.  Moreover, even if there

were a waiver of immunity, Dawson did not comply with the notice requirements of § 41-4-16 in proceeding with such claims.  Therefore, the state law claims against the City and or City employees must be dismissed.

## IV.    FAILURE TO SUPERVISE CLAIM AGAINST CITY

Dawson alleges that the City failed to instruct, supervise, control and/or discipline the individually named Defendants to "refrain from conducting unlawful seizures and arrests, and conspiring to violate federally protected rights, and otherwise depriving citizens of their constitutional and statutory rights . . . ."  [Complaint, Count 17.]  More specifically, Dawson claims that the City is actively promoting an unconstitutional policy of towing vehicles "and giving [the vehicles] away to the towing company to do as it wishes."  [Doc. 123, p. 14.]

Dawson's claim cannot survive summary judgment.  Municipalities and other local governmental units may not be sued under § 1983 for injuries inflicted solely by its employees or agents.  Monell v. Dep't of Social Services, 436 U.S. 658, 694, 98 S.Ct. 2018 (1978).  Instead, it is when the execution of a government's policy inflicts the injury that the government as an entity is responsible under § 1983.  Id.  The purpose of requiring an "official policy" is to distinguish between the act of a city and the act of its employees.  Ross v. United States, 910 F.2d 1422, 1429 (7th Cir. 1990).  Liability also might attach to the municipality if the plaintiff demonstrates "a widespread practice that . . . causes a constitutional deprivation and is so permanent and well settled as to constitute a custom and usage with the force of law."  City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S.Ct. 915 (1988).

A municipality, however, cannot be held liable under § 1983, where no injury or constitutional violation occurred in the first place.  See City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S.Ct.

1571 (1986) (holding that if no constitutional injury was suffered by the individual at the hands of the police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force, for example, is beside the point); Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir. 1993) (municipality cannot be held liable for constitutional violations when there were no underlying constitutional violations by any of its officers).  Here, the Court already has determined that no constitutional injury was suffered by Dawson.  This is fatal to his claim of municipal liability, even if Dawson could, which he cannot, demonstrate an unlawful city policy or practice.

In addition, the City's Ordinance authorizes the towing of vehicles in a scenario like the one Dawson and the officers confronted on September 25, 2001.  In other words, the applicable ordinance specifically allowed towing of a vehicle when there is no current proof of insurance.  The ordinance also allowed for towing when the driver in control was lawfully taking into custody by the police officer and/or the vehicle was parked on a roadway that might create a hazardous situation.  § 8-5-2-4 (2), (7).  Dawson simply presents no evidence to demonstrate a policy or widespread practice that resulted in violating an individual's rights.  Furthermore, there is no proof that the City's  pertinent policies or ordinances regarding towing vehicles are in any way unconstitutional.  Indeed, many municipalities have passed similar ordinances.  Moreover, federal law provides further support that the City may tow vehicles as part of its safekeeping function and that its right to do cannot be challenged.

Based on the foregoing discussion, there is no genuine issue of material fact with respect to the municipal liability claim and it must be dismissed.

**V.     CLAIMS AGAINST TOWN & COUNTRY**

Dawson asserts constitutional and common law claims against the towing operator, Town &
Country and further argues that his claims against Town & Country should be granted because Town
& Country did not file a response to motion for summary judgment.  While Dawson's argument might
have been correct at one time that the failure to respond to a motion for summary judgment was
deemed consent to granting the motion, that no longer is the law in this circuit.  In Reed v. Bennett,
312 F.3d 1190 (10th Cir. 2002), the Tenth Circuit recently held that the court could not grant
summary judgment in favor of a party merely because of the non-movant's failure to file a response
to the motion.  Moreover, the burden on the non-movant to respond arises --

> only if the summary judgment motion is properly 'supported' as required by Rule
> 56(c).  Accordingly, summary judgment is 'appropriate' under Rule 56(e) only when
> the moving party has met its initial burden of production under Rule 56(c).  If the
> evidence produced in support of the summary judgment motion does not meet this
> burden, 'summary judgment must be denied *even if no opposing evidentiary matter
> is presented.*

Id. at 1194 (internal citation omitted) (emphasis in original).

Here, it is true that Town & Country's activities may be considered state action since the
towing company was acting under the direction of the police.  However, because the Court concludes
that none of the City Defendants violated Dawson's constitutional rights, the towing company could
not have done so either.  Smyth, 83 F.3d 433, 1996 WL 194715 at *5.  In addition, to the extent that
Dawson claims the towing company also violated his constitutional right to notice and/or a hearing,
this claim also must fail.  Town & Country's actions were limited to towing, which the Court already
has found to have been constitutionally permissible.  The failure to notice Dawson's right to a hearing

is unrelated to Town & Country's activities.  Huemmer v. Mayor and City Council of Ocean City, 632 F.2d 371, 372 (4th Cir. 1980).

Thus, Town & Country's failure to respond is of no consequence where a moving party failed to meet its prima facie burden.  Here, the Court rejects Dawson's summary judgment claim and determines that Dawson failed to meet his burden of production.  Therefore, under Reed v. Bennett, no response was necessary.

Dawson also asserts the state tort claims of conversion and unjust enrichment against Town & Country.  The Court declines to exercise supplemental jurisdiction over these remaining state law claims against the towing company, and they will be dismissed, without prejudice.  28 U.S.C. § 1367 (c)(3).

## VI.    CLAIM FOR INJUNCTIVE RELIEF

In Dawson's prayer for relief, he also requests a permanent injunction against Defendants from towing vehicles in accordance with their alleged current custom and policy.  [Complaint, p. 11.] This claim too is rejected.  Equitable relief is available only where the plaintiff who has suffered a prior injury can show that there is a "real or immediate threat that the plaintiff will be wronged again in a similar way. . . ."  Los Angeles v. Lyons, 461 U.S. 95, 111, 103 S.Ct. 1660 (1983).  A speculative claim of future injury is insufficient to establish standing.  Here, Dawson has produced no evidence that there is any likelihood that he will be subjected in the future to the towing or impoundment policy.  So, too, Dawson fails to show the violation of a constitutional right; fails to show the possibility of success on the merits; fails to show the inadequacy of an available remedy. In sum, he fails to demonstrate the requisite elements for injunctive relief, and his claim for injunctive relief will be dismissed.

31

**Conclusion**

For the above-discussed reasons, the Court concludes that Defendants' Motion for Summary Judgment should be granted and that Plaintiff's Motions for Summary Judgment should be denied. Therefore, Plaintiff's entire lawsuit will be dismissed, with prejudice, with the exception of the two state tort claims alleged against Town & Country which are dismissed, without prejudice.

IT IS THEREFORE ORDERED that Plaintiff's two Motions for Summary Judgment [Docs. 122, 123] are DENIED and that Defendants' Motion for Summary Judgment [Doc. 124] is GRANTED, thereby dismissing all of Plaintiff's claims with prejudice, with the exception of the two state tort claims against Defendant Town & Country, which are dismissed, without prejudice.

Lorenzo F. Garcia
United States Magistrate Judge